AB:JV
F# 2019R00434

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEIZURE OF:
A COMPUTER HOUSED IN A COOLER
MASTER BRAND HOUSING TOWER
AND BEARING THE BAR CODE
RC912KKN11131500811 AND A ONE
TERABYTE WESTERN DIGITAL
WD10EALX HARD DRIVE BEARING
THE SERIAL NUMBER WCATR9321079
LOCATED AT THE PREMISES KNOWN
AND DESCRIBED AS 950 72ND STREET,
APT. #2A

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A
WARRANT TO SEIZE**

19-M-1101

I, CHRISTOPHER R. ROMMENEY, being first duly sworn, hereby depose
and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the
Federal Rules of Criminal Procedure for a warrant to seize a computer housed in a "Cooler
Master" brand housing tower and bearing the bar code RC912KKN11131500811 (the
"COMPUTER") and a 1 Terabyte Western Digital WD10EALX Hard Drive bearing the
serial number WCATR9321079 (the "HARD DRIVE") located at the premises known and
described as 950 72nd Street, Apt. # 2A in Brooklyn, NY 11228 (the "SUBJECT
PREMISES"), further described in paragraphs 5, 11-14 infra and in Attachment A, and for
the things described in Attachment B.

2.      I am a Special Agent with the Department of Homeland Security,
Homeland Security Investigations ("HSI") and have been employed as a Special Agent

since 2003.  I was previously employed by New York State Office of the Inspector General, as a Special Agent for three years.  I have received specialized training and have experience in the enforcement of federal laws including the Lacey Act and the Endangered Species Act ("ESA").  I have participated in federal investigations, either as a case agent or officer or in various support roles, including investigations involving the unlawful transport, export, import, possession and sale of wildlife.  I have also received training and participated in the execution of search warrants, including search warrants for premises and electronic devices and digital evidence found therein.

3.      The information in this affidavit is based on my participation in this investigation, review of various documents and information from other law enforcement officers.

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  Unless otherwise indicated, statements attributed to individuals in the affidavit are set forth in sum, substance and in part.

## **PROBABLE CAUSE**

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the COMPUTER and HARD DRIVE described in Attachment B, and located at the SUBJECT PREMISES, further described in Attachment A, constitutes evidence, and are instrumentalities of, violations of federal criminal laws, including: smuggling goods out of the United States, in violation of Title 18, United States Code, Section 554; laundering the proceeds of smuggling and conducting financial transactions to promote smuggling, in violation of Title 18, United States Code,

2

Section 1956; importing, exporting, taking, possessing, selling, delivering, receiving and

offering for sale in interstate or foreign commerce endangered species of wildlife, in

violation of Title 16, United States Code, Section 1538; and making or submitting any false

record or label for, or any false identification of, any wildlife which has been, or is intended

to be, transported in interstate commerce or foreign commerce, in violation of Title 16,

United States Code, Section 3372; and conspiracy to commit the foregoing offenses, in

violation of Title 18, United States Code, Section 371 (collectively, the "Subject Offenses")

by Eugene Lantsman and his son, Leonid Lantsman.

## PRIOR APPLICATION

6.      On November 14, 2019, the United States made an application for a

warrant to search the search the premises known and described as 950 72nd Street, Apt. #

2A and associated storage unit in Brooklyn, NY 11228, and any locked and closed items

contained therein.  See Attachment C hereto, Affidavit in Support of an Application for a

Warrant to Search and Seize dated November 14, 2019.  I hereby adopt and incorporate the

November 14, 2019 Affidavit in Support of an Application for a Warrant to Search and

Seize.

7.      The Honorable James Orenstein, United States Magistrate Judge, granted

the application in part and denied it in part.  The Court found that the November 14, 2019

Affidavit submitted in support of the application for a warrant did "not include any

allegation that the suspect keeps any [] computers or storage media in the subject premises."

See Attachment D hereto, Memorandum and Order dated November 14, 2019, at 1 (19-

MC-1074 (JO)).  The Court further found that "the government may conduct a search of the

premises for paper records and other physical evidence or instrumentalities of the offenses

under investigation (see Aff. Attachment B, item 1) and then, if it discovers electronic

devices, return to the court seeking a warrant to search those devices." Id. at 3.

Accordingly, on November 14, 2019, the Court issued a Search Warrant for the Premises

consistent with its Memorandum and Order.  See Attachment E hereto.

### EXECUTION OF THE NOVEMBER 14, 2019 SEARCH WARRANT

8.      The United States executed the November 14, 2019 Search Warrant for the

SUBJECT PREMISES this morning.

9.      During the execution of the November 14, 2019 Search Warrant, Marina

Lantsman, the wife of Eugene Lantsman returned home.

10.      Marina Lantsman told law enforcement agents that she did not work for

Arms and Antiques Inc.  In sum and substance, she advised law enforcement agents that

there was a computer in the home office of her husband, Eugene Lantsman.  In sum and

substance, Marina Lantsman stated that her husband used the computer and that she did not

use it, as she only used her cellphone.

11.      During the execution of the Search Warrant, law enforcement agents

located a home office which contained the COMPUTER and numerous antique weapons,

antique items and non-fiction books concerning antique weapons, armor and metals.

12.     Photographs of Eugene Lantsman's home office showing the location of the COMPUTER are included below:



13.     The COMPUTER appears to be a home-built or specially constructed computer, as opposed to an already assembled computer available at retail, because it uses a separately purchased housing unit that can contain separately purchased computer components.  The component parts of the COMPUTER cannot be identified without opening the housing unit.

14.     Also during the execution of the Search Warrant, law enforcement agents located the HARD DRIVE in a closet in the living room of the SUBJECT PREMISES.  The HARD DRIVE appears to be one that could be a component of the COMPUTER or attached to the COMPUTER as external storage.

15. As described above and in Attachment B, this application seeks permission to seize the COMPUTER and HARD DRIVE as evidence and instrumentalities of the Subject Offenses.

16. *Probable cause.* I submit that there is probable cause to believe that evidence of the Subject Offenses will be stored on the COMPUTER and HARD DRIVE, for at least the following reasons:

    a. Based on my training and experience, I know that wildlife traffickers commonly use electronic means, including computers, to coordinate the purchase, shipment, and payment for internationally smuggled wildlife.

    b. Furthermore, based on my knowledge and consultation with FWS' computer forensic technicians, I know that the continuing viability of a criminal operation dealing in the illegal smuggling of wildlife is dependent upon the storage of such information, either electronically, manually written, or both. Additionally, customer lists, customer contact information, shipping records and bank records are essential. Persons engaged in these kinds of activities tend to keep this information readily and conveniently accessible either electronically though computers, manually written or both.

    c. Therefore, I believe that the COMPUTER and HARD DRIVE constitute evidence, contraband, fruits, and instrumentalities of the Subject Offenses.

    d. Based on actual inspection of other evidence related to this investigation, including invoices, shipping records, bills or receipts, digital photographs, email communications, and advertising on the Website as detailed in Exhibit C hereto, I am aware that computer equipment was used to generate, store, and transmit documents used in the wildlife smuggling scheme.

    e. Based on statements made by Marina Lantsman, there is reason to believe that the COMPUTER was used exclusively by Eugene Lantsman.

    f. Eugene Lantsman previously advised law enforcements agents that he operated Arms and Antiques Inc. from the SUBJECT PREMISES.

    g. Arms and Antiques Inc. has a website that includes digital photographs of merchandise available for sale, communicates with customers through electronic mail and receives payments through PayPal.

    h. Other than the COMPUTER, no other computer was found on the SUBJECT PREMISES.

i.  The COMPUTER was found in a home office, which Marina Lantsman stated was Eugene Lantsman's office.

j.  The COMPUTER appears specially assembled, and allows for the housing and substitution of hard drives and other computer components.

k.  Based on my experience and training, individuals with home-built or specially constructed computers sometimes change hard drives to increase storage capacity or to save files on an external hard drive.

l.  The HARD DRIVE was found on the SUBJECT PREMISES.

17.  *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of premises for information that may be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with any later received warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  The time required for an examination: As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements: Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that may not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media: Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

18.      *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant.  At the current time, we do not have resources in place to image the COMPUTER and HARD DRIVE at the SUBJECT PREMISES.  Nonetheless, if the Court issues the seizure warrant requested, the United States will take custody of the COMPUTER and HARD DRIVE, will image the devices, and then return them to Eugene Lantsman.

## CONCLUSION

19.     I submit that this affidavit supports probable cause for a warrant to search

the SUBJECT PREMISES described in Attachment A and seize the COMPUTER AND

HARD DRIVE as described in Attachment B.

                                        Respectfully submitted,


                                        ___S/ Christopher Rommeney_____
                                        CHRISTOPHER R. ROMMENEY
                                        Special Agent
                                        Department of Homeland Security
                                        Homeland Security Investigations

Subscribed and sworn to before me
this 20th day of November, 2019


_S/ James Orenstein_____
THE HONORABLE JAMES ORENSTEIN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

*Property to be Searched*

The SUBJECT PREMISES is a single-family condominium unit and associated storage unit located at 950 72nd Street, Apt. 2A, Brooklyn, NY 11228 (the "950 Address").  The 950 Address is a brown and white colored three (3) floor condominium building located on 72nd Street between 10th Avenue and Fort Hamilton Parkway.  The condominium unit is located on the second floor and the storage unit is located in the cellar.  There are stairs leading up to the second floor where the SUBJECT PREMISES's residential unit door is located.  A front porch is attached to the SUBJECT PREMISES.  The number "950" appears on the front of the second floor balcony.  The front door to the SUBJECT PREMISES is white with windows on the top of the door, and is the left one of the two doors located on the second floor of the 950 Address.  The SUBJECT PREMISES door bears a visible lock.  A photograph of the building containing the SUBJECT PREMISES is provided below:



## **ATTACHMENT B**

*Property to be Seized*

1.        All records relating to, and instrumentalities of, violations of 16 U.S.C. §§

1538, 3372(a)(2)(A) and 3372(d), and 18 U.S.C. §§ 371, 554 and 1956, those violations

including acts by Eugene Lantsman, Leonid Lantsman and Arms and Antiques Inc. and

occurring after April 19, 2015, including:

   a.  a computer housed in a "Cooler Master" brand housing tower and
       bearing the bar code RC912KKN11131500811; and

   b.  a 1 Terabyte Western Digital WD10EALX Hard Drive bearing the
       serial number WCATR9321079 (the "HARD DRIVE").

# ATTACHMENT C

SSS:JV
F# 2019R00434

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: THE PREMISES KNOWN AND DESCRIBED AS 950 72ND STREET, APT. #2A AND ASSOCIATED STORAGE UNIT, BROOKLYN, NEW YORK 11228, AND INSIDE ANY LOCKED AND CLOSED ITEMS CONTAINED THEREIN | **AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A WARRANT TO SEARCH AND SEIZE** <br><br> 19-M-1074 |

I, CURTIS KNIGHTS, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a warrant to search the premises known and

described as 950 72nd Street, Apt. # 2A and associated storage unit in Brooklyn, NY 11228,

and any locked and closed items contained therein (the "SUBJECT PREMISES"), further

described in paragraphs 47-50 infra and in Attachment A, for the things described in

Attachment B.

2.      I am a Special Agent with the United States Fish and Wildlife Service

("FWS") and have been employed as a Special Agent since March 2016.  I was previously

employed by the FWS, Office of Law Enforcement, as a Wildlife Inspector for five years.  I

have received specialized training and have experience in the enforcement of federal laws

including the Lacey Act and the Endangered Species Act ("ESA"), described in greater

detail below.  I have also received training in and have had experience in identifying

potentially federally regulated wildlife through visual inspection.  I have participated in

numerous federal investigations, either as a case agent or officer or in various support roles, including investigations involving the unlawful killing, transport, export, import, possession and sale of wildlife. I have also received training and participated in the execution of search warrants, including search warrants for premises and electronic devices and digital evidence found therein.

3.      The information in this affidavit is based on my participation in this investigation, review of various documents and information from other law enforcement officers.

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Unless otherwise indicated, statements attributed to individuals in the affidavit are set forth in sum, substance and in part.

## PROBABLE CAUSE

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that there is located in the SUBJECT PREMISES, further described in Attachment A, the things described in Attachment B, which constitute evidence, fruits and instrumentalities of violations of federal criminal laws, including: smuggling goods out of the United States, in violation of Title 18, United States Code, Section 554; laundering the proceeds of smuggling and conducting financial transactions to promote smuggling, in violation of Title 18, United States Code, Section 1956; importing, exporting, taking, possessing, selling, delivering, receiving and offering for sale in interstate or foreign commerce endangered species of wildlife, in violation of Title 16, United States Code, Section 1538; and making or submitting any false record or

2

label for, or any false identification of, any wildlife which has been, or is intended to be, transported in interstate commerce or foreign commerce, in violation of Title 16, United States Code, Section 3372; and conspiracy to commit the foregoing offenses, in violation of Title 18, United States Code, Section 371 (collectively, the "Subject Offenses").

## FEDERAL LAWS RELATING TO TRAFFICKING IN WILDLIFE

6.     The FWS enforces several laws and regulations relating to trafficking in wildlife including the ESA, 16 U.S.C Sections 1538 et seq.; the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), the Lacey Act Amendments of 1981, 16 U.S.C. Sections 3371 et seq.; and 18 U.S.C. Section 554.

7.     CITES is an international treaty that provides protection to fish, wildlife and plants that may become imperiled due to the demands of international markets.  CITES has been signed by more than 170 countries around the world.  The United States has implemented CITES as part of the ESA and the regulations promulgated thereunder.  See 16 U.S.C. § 1538(c)(l) (providing that it shall be "unlawful for any person subject to the jurisdiction of the United States to engage in any trade in any specimens contrary to the provisions of [CITES], or to possess any specimens traded contrary to the provisions of [CITES] and the regulations promulgated thereunder"); 50 C.F.R. Parts 14 and 23.

8.     "Fish or wildlife" are defined, in pertinent part, as "any wild animal, whether alive or dead . . . and including any part [or] product . . . thereof."  50 C.F.R. § 10.12.

9.     Based on my training and experience I know that species protected under CITES are listed in a series of appendices (Appendices I, II and III).  Appendix I includes species threatened with extinction and provides the greatest level of protection.

3

International trade in Appendix I species for primarily commercial purposes is essentially prohibited. Appendix II includes species that, although not currently threatened with extinction, may become so without trade controls. Under Appendix I of CITES, a CITES-protected species may be exported from the United States to a foreign country only if, prior to exportation, the exporter possesses a valid CITES export permit issued by United States and a valid CITES import permit issued by the foreign country. Under Appendix II of CITES, a species may be exported from the United States to a foreign country only if, prior to exportation, the exporter possesses a valid CITES export or re-export permit from the United States.

10.     An animal species listed as protected under CITES cannot be exported from the United States without prior notification and approval from the FWS. Under CITES, signatory countries may limit the export of specific animal species for ecological or other reasons. Regulations promulgated by the FWS do not permit such limited species to be exported from the United States. For the FWS to approve exportation of a CITES-protected species, the exporter must submit to FWS accurate copies of packing lists and CITES permits issued by the United States regarding the shipment to be exported.

11.     Several federal laws criminalize the importation, export or possession of wildlife trafficked in violation of federal laws and regulations, including CITES. Among them, Title 18, United States Code, Section 554 makes it a felony for a person to fraudulently or knowingly export or send out of the United States, any merchandise contrary to law, or receives, conceals, buys, sells or in any manner facilitates the transportation, concealment or sale of such merchandise prior to exportation, knowing the same to have been exported from the United States contrary to law.

4

## THE INVESTIGATION

12.     On or about September 27, 2018, a package was intercepted by the United States Customs and Border Protection ("CBP") at the United States Postal Service International Mail Facility ("USPS IMF") at John F. Kennedy International Airport ("JFK") in Queens, New York (the "Subject Package"). The Subject Package listed the sender's name as "Eugene Lantsman," provided the SUBJECT PREMISES as the sender's address and was addressed to be sent to Hong Kong, China. The Subject Package was declared to contain "Antique Decorative Metalwork, Circa 1900, Origin China, Iron Brass" valued at $2,400. The tracking number assigned to the Subject Package was EZ117720415US.

13.     A CBP officer opened and inspected the contents of the Subject Package. The Subject Package contained a sword with a handle that appeared to be composed of wildlife. The CBP officer referred the package to FWS.

14.     On or about September 27, 2018, a FWS Wildlife Inspector inspected the Subject Package and identified the sword handle to be composed of what appeared to be sea turtle shell.

15.     A Senior Forensic Scientist at the FWS National Fish and Wildlife Forensics Laboratory who has received training in the identification of sea turtle parts, identified the sword handle to be composed of either Green Sea Turtle (*Chelonia mydas*) or Hawksbill Sea Turtle (*Eretmochelys imbricata*), both of which are listed as endangered under the ESA and listed under CITES Appendix I.

### Identification of Arms and Antiques Inc.

16.     An internet query for "Eugene Lantsman" returned results indicating that he was the "Chief Executive Officer" for "Arms and Antiques Inc."

5

17.     An internet query for Arms and Antiques Inc. resulted in the discovery of WWW.ARMSANDANTIQUES.COM (the "Website").

18.     A query of the New York State Department of State revealed that Arms and Antiques Inc. was registered as a "domestic business corporation" in Kings County, New York, on March 4, 2011.  Eugene Lantsman is listed as the Chief Executive Officer and provides the SUBJECT PREMISES as the address.

<u>Interview of Eugene Lantsman</u>

19.     On February 21, 2019, a FWS Wildlife Inspector and I interviewed Eugene Lantsman.

20.     Eugene Lantsman initially stated that Arms and Antiques Inc. was "not a business," but a hobby.  He stated that he registered Arms and Antiques Inc. once he began selling items from his collection and annual sales exceeded $10,000.

21.     Eugene Lantsman stated that he sells items "two, three times a year" and that sales are conducted at tradeshows or via the Website.

22.     Eugene Lantsman stated that the Website is hosted by GoDaddy.com, LLC.

23.     Eugene Lantsman stated that approximately "2%" of Arms and Antiques Inc.'s transactions involve importing and exporting shipments and that Arms and Antiques Inc. has shipped approximately "once in two years or three years" internationally.

24.     Eugene Lantsman stated that prospective buyers contact him via the Website and messages are sent to "INFO@ARMSANDANTIQUES.COM" (the "Business Email").  Both Eugene Lantsman and his adult son, Leonid Lantsman, respond to email inquiries.

25.     Eugene Lantsman stated that both his home in Brooklyn, New York, and his son's home in Alexandria, Virginia, are used for the Arms and Antiques Inc. operations, including inventory.

26.     Eugene Lantsman stated that Arms and Antiques Inc. receives payments for sales via cash or checks at tradeshows, and via PayPal or wire transfer for international transactions.

27.     Eugene Lantsman stated that he purchased the sword with the turtle handle at a flea market in Brimfield, Massachusetts, during the summer of 2018, for approximately $500-600.  He then transported the sword to the SUBJECT PREMISES.

28.     Eugene Lantsman stated that the buyer of the sword initially contacted him via the Website and they communicated via the Business Email regarding the price and shipping of the sword.

29.     Eugene Lantsman stated that he sold the sword for $18,000 and that it was being shipped to Hong Kong, China.

30.     Eugene Lantsman stated that he did not suspect this sword was composed of sea turtle shell, though he confirmed that he was knowledgeable of the characteristics of sea turtle shell.  Eugene Lantsman stated that he was not aware of items that he's previously sold or had in his collection that contained wildlife, including "crocodile leather, stingray leather, cow, buffalo horn, walrus ivory, elephant ivory, possible tortoise shell, deer, stag horn, coral."

<u>Review of the Website for Wildlife Products</u>

31.     From February 2019 through October 2019, I reviewed the publicly viewable Website, which revealed approximately 87 items that have been sold that were

described as containing, or which, based on included photographs, appeared to contain what appeared to be federally regulated wildlife. A partial list of wildlife items, all of which are regulated under ESA and CITES, that have been sold via the Website includes:

      a. An "Antique Japanese Muromachi Period 16th c. Tanto Dagger with NBTHK Papers for Osafune Kiyomitsu" described as containing, and including a photograph which appeared to contain, "shark skin" and what appears to be elephant ivory.

      b. A "Magnificent 18th C. Shield from the Udaipur Maharana Sangram Singh II of Mewar" described as containing "rhinocerous [sic] hide."

      c. A "Rare 19th C. Scottish or German Whale Tooth Powder Flask" described as containing, and including a photograph which appeared to contain, a "whale tooth."

32.     Likewise, an October 4, 2019 review of the Website listed an "Ethiopian Abyssinian Shotel Sword" and included a photograph which appeared to contain rhinoceros horn.

<u>Review of Arms and Antiques Inc. Import/Export History</u>

33.     On April 19, 2019, I reviewed the export history for the SUBJECT PREMISES and the Alexandria, Virginia, addresses associated with Arms and Antiques Inc.

34.     From October 2012 to February 2019, Eugene and Leonid Lantsman exported approximately 61 packages from the United States, with approximately 52 of those shipments declared to contain antiques or metal. Shipment destination countries included, in part, Qatar, France, Australia, China and Russia.

35.     From August 2010 to March 2019, Eugene and Leonid Lantsman imported approximately 38 packages into the United States, with approximately 23 of those shipments declared to contain antiques.

36.    A query of the FWS Law Enforcement Management Information System ("LEMIS") revealed that Arms and Antiques Inc. applied for and was issued a FWS import/export license in December 2014, which expired in November 2015. The application documents associated with this license stated that Leonid Lantsman was the president of Arms and Antiques Inc.

37.    Arms and Antiques Inc. applied for and was issued a renewal FWS import/export license in November 2015, which expired in October 2016.

38.    A query of the FWS LEMIS revealed that Arms and Antiques Inc. declared one export of a weapon containing walrus ivory to Austria on December 15, 2015. Leonid Lantsman applied for the CITES permit which accompanied this shipment to Austria. In the application documents, Leonid Lantsman highlighted his identification credentials by stating the following, "I specialize in antique arms and armor focusing on oriental and eastern items from China, Korea, Japan, India and the Caucasus region. I have catalogued artifacts in the Smithsonian Museum Anthropology Archives. Specifically, I was responsible for identifying and cataloguing oriental arms and armor items in the Smithsonian Anthropology archives in Suitland, Maryland."

### Review of Arms and Antiques Inc. PayPal Records

39.    On April 19, 2019, I reviewed two PayPal Holdings, Inc. accounts registered to Arms and Antiques Inc., which were opened in August 2000 and March 2011. As of April 2, 2019, these accounts had received $1,329,384.48 and had sent $466,915.46. Both of the PayPal accounts included the SUBJECT PREMISES as a registered address for a "Home or Work" address.

9

40.     These PayPal accounts identified approximately 86 international transactions associated with Arms and Antiques Inc.

### Review of Business Email Communications

41.     On April 30, 2019, the Honorable Ramon E. Reyes, Jr. issued a search warrant for information associated with the Business Email in the possession of Google Inc. From May 2019 through October 2019, I reviewed documents associated with the Business Email, including communications sent from and received by the Business Email. This review was inclusive of communications sent and received from January 1, 2015, to February 21, 2019. Both Eugene and Leonid Lantsman used the Business Email to communicate with clients and each other.

42.     My review of email communications revealed multiple conversations highlighting Eugene and Leonid Lantsman's knowledge of wildlife identification, including ivory, sea turtle shell and rhinoceros horn.

43.     My review of email communications revealed multiple conversations highlighting Eugene and Leonid Lantsman's knowledge of federal wildlife and customs regulations, specifically, the prohibition of shipping items containing wildlife outside of the United States without declaration to FWS and CITES permits.

44.     My review of email communications revealed multiple instances of Eugene and Leonid Lantsman selling, offering to ship and shipping wildlife in violation of federal and state regulations, examples of which include:

> a. In May 2015, Leonid Lantsman sold and shipped one sword, described as having a shark skin scabbard, to China via USPS tracking number EZ061116705US. The sword was sold for $4,675 including shipping.

10

b.  In December 2016, Leonid Lantsman sold and shipped one sword, described as having a stingray skin handle, to Hong Kong via FedEx tracking number 777983890516. The sword was sold for $18,150 including shipping.

c.  In January 2017, Leonid Lanstman sold and paid for the shipment of one sword, described as having an ivory handle, to Canada via FedEx tracking number 778183785276. The sword was sold for $5,400.

d.  In August 2017, Eugene Lantsman sold and shipped one sword, described as including walrus ivory, to Hong Kong via USPS tracking number EZ049392302US. The sword was sold for approximately $2,900.

e.  In September 2018, Eugene Lantsman sold and Leonid Lantsman shipped one sword with sea turtle shell handle to Hong Kong via USPS tracking number EZ117720415US. The sword was sold for $18,000. This was the sword that was seized by the FWS as set forth in paragraphs 13-15 supra.

f.  In February 2019, Eugene Lantsman offered to ship one sword, described as having a rhinoceros handle, to Hong Kong. This sword was being offered as a replacement to the buyer of the sword that was seized by the FWS as set forth in paragraphs 13-15 supra.

45.     My review of email communications observed multiple communications that confirmed that Arms and Antiques Inc.'s inventory is stored in the SUBJECT PREMISES and in Leonid Lantsman's Alexandria, Virginia residence.[1] Notable communications include:

a.  On April 9, 2015, while discussing potential items for sale, Leonid Lantsman stated, "My collection is in DC. If you'll be down here I'd be happy to host you to view the collection and then lunch or dinner if it would be on a weekend."

b.  On June 20, 2015, while discussing the sale of a "Gorgeous 19th C. Chinese jade Screen inlaid with Hardstones Ex.," Leonid Lantsman stated, "Ok great.

_____

[1] Leonid Lantsman lives in Alexandria, Virginia, which is bounded to the East by the Potomac River. Alexandria, Virginia is south of Washington, D.C., which is bounded to the West by the Potomac River. The U.S. Census Bureau recognizes the "Washington-Arlington-Alexandria DC-VA-MD-WV Metropolitan Statistical Area," which is sometimes referred to as "the D.C. Area."

I'll put it on hold until payment and can have it shipped from my NY location."

    c.   On October 13, 2017, while discussing potential items for sale, Leonid Lanstman stated, "I ended up purchasing the entire collection. You can view at my fathers [*sic*] house if you're interested."

    d.   On November 12, 2017, while discussing potential items for sale, Leonid Lantsman stated, "Yes we have several new fine swords. They're at my fathers [*sic*] house. I'd recommend you set up a time to visit him in Brooklyn and you can view everything in person."

    e.   On January 18, 2019, while discussing potential items for sale, Leonid Lantsman stated, "I'm based in Washington DC and New York."

46.     Based on my training and experience, I know that wildlife traffickers may smuggle smaller items containing wildlife, for example teeth, tusks and horns, and often conceal such items in larger closed and locked containers.

### THE SUBJECT PREMISES

47.     The SUBJECT PREMISES is a single-family condominium unit and associated storage unit owned by Eugene Lantsman since August 1999, and located at 950 72nd Street, Brooklyn, New York 11228. The condominium unit is located on the second floor and the storage unit is located in the cellar.

48.     The condominium association includes two buildings and six units located at 950 and 954 72nd Street, Brooklyn, New York 11228.

49.     The address provided for the Subject Package was "950 72nd Street, Apt# 2A, Brooklyn, NY 11228," though the package was shipped from a USPS location in Alexandria, Virginia.

50.     During an interview conducted by FWS, Eugene Lantsman stated that Arms and Antiques Inc. does not have a storefront. Eugene Lantsman stated that the SUBJECT

PREMISES serves as the business location in New York.  Furthermore, Eugene Lantsman

stated that his son, Leonid Lantsman, also operates the business from Leonid Lantsman's

home.  Leonid Lantsman owns the single-family townhouse located at 704 Devon Place,

Alexandria, VA 22314.  Eugene Lantsman stated that the inventory for the business is stored

at both homes in Brooklyn, New York and Alexandria, Virginia.

## TECHNICAL TERM

51.     Based on my training and experience, I use the technical term "storage

medium" to convey the meaning that storage medium is any physical object upon which

computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash

memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS AND ELECTRONIC STORAGE

52.     As described above and in Attachment B, this application seeks permission to

seize evidence of the Subject Offenses, in whatever form they are found.  One form in which

evidence may be found is data stored on a computer's hard drive or other storage media.

Thus, the warrant applied for would authorize the seizure of computers and electronic storage

media or, potentially, the copying of electronically stored information, all under Rule

41(e)(2)(B).

53.     *Probable cause.*  I submit that if a computer or storage medium is found on the

SUBJECT PREMISES, there is probable cause to believe that evidence of the Subject

Offenses will be stored on that computer or storage medium, for at least the following

reasons:

> a.  Based on my training and experience, I know that wildlife traffickers
>     commonly use electronic means, including computers, to coordinate the
>     purchase, shipment, and payment for internationally smuggled wildlife.

13

b. Furthermore, based on my knowledge and consultation with FWS' computer forensic technicians, I know that the continuing viability of a criminal operation dealing in the illegal smuggling of wildlife is dependent upon the storage of such information, either electronically, manually written, or both. Additionally, customer lists, customer contact information, shipping records and bank records are essential. Persons engaged in these kinds of activities tend to keep this information readily and conveniently accessible either electronically though computers, manually written or both.

c. Therefore, I believe that items of evidence including address books, telephone records, credit card and bank account records including account numbers and personal identifiers, checkbooks, invoices, shipping records, item numbers, photographs of inventory, wire transfer documents and statements will be found at the SUBJECT PREMISES. Additionally, I believe that computer data, files and records described in Attachment B, likely to be found at the SUBJECT PREMISES, constitute evidence, contraband, fruits, and instrumentalities of illegal activities described herein.

d. Based on actual inspection of other evidence related to this investigation, including invoices, shipping records, bills or receipts, digital photographs, email communications, and advertising on the Website as detailed supra, I am aware that computer equipment was used to generate, store, and transmit documents used in the wildlife smuggling scheme. There is reason to believe that there is a computer system currently located in the SUBJECT PREMISES.

54. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of premises for information that may be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with any later received warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent loss of the data either from accidental or intentional destruction. This is true because of the following:

14

a.  The time required for an examination: As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements: Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that may not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media: Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

55.     *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant.

56.     Based on surveillance, it appears that Eugene Lantsman resides at the SUBJECT PREMISES with his wife.  Because Eugene Lantsman's wife shares the SUBJECT PREMISES as a residence, it is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  To the extent that it can be established that computers or storage media are owned and used exclusively by Eugene Lantsman's wife, they will not

15

be seized.  If it is nonetheless determined that it is possible that the things described  in

this warrant could be found on any of those computers or storage media, the warrant

applied for would permit the seizure of those items as well.

## CONCLUSION

57.     I submit that this affidavit supports probable cause for a warrant to search

the SUBJECT PREMISES described in Attachment A and seize the items described in

Attachment B.

## REQUEST FOR SEALING

58.     It is respectfully requested that this Court issue an order sealing, until

further order of the Court, all papers submitted in support of this application, including

the application and search warrant.  I believe that sealing this document is necessary

because the items and information to be seized are relevant to an ongoing investigation

into the criminal conspiracy and not all of the targets of this investigation, known and

unknown, will be searched at this time.  Based upon my training and experience, I have

learned that criminals actively search for criminal affidavits and search warrants via the

Internet, and disseminate them to other online criminals as they deem appropriate, *i.e.*,

post them publicly online.  Premature disclosure of the contents of this affidavit and

related documents may have a significant and negative impact on the continuing

investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

CURTIS KNIGHTS
Special Agent
United States Fish and Wildlife Service

Subscribed and sworn to before me
this 14th day of November, 2019

THE HONORABLE JAMES ORENSTEIN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

17

## ATTACHMENT A

*Property to be Searched*

The SUBJECT PREMISES is a single-family condominium unit and associated storage unit located at 950 72nd Street, Apt. 2A, Brooklyn, NY 11228 (the "950 Address"). The 950 Address is a brown and white colored three (3) floor condominium building located on 72nd Street between 10th Avenue and Fort Hamilton Parkway. The condominium unit is located on the second floor and the storage unit is located in the cellar. There are stairs leading up to the second floor where the SUBJECT PREMISES's residential unit door is located. A front porch is attached to the SUBJECT PREMISES. The number "950" appears on the front of the second floor balcony. The front door to the SUBJECT PREMISES is white with windows on the top of the door, and is the left one of the two doors located on the second floor of the 950 Address. The SUBJECT PREMISES door bears a visible lock. A photograph of the building containing the SUBJECT PREMISES is provided below:



## ATTACHMENT B

*Property to be Seized*

1.    All records relating to violations of 16 U.S.C. §§ 1538, 3372(a)(2)(A) and

3372(d), and 18 U.S.C. §§ 371, 554 and 1956, those violations including acts by Eugene

Lantsman, Leonid Lantsman and Arms and Antiques Inc. and occurring after April 19,

2015, including:

> a.  any and all records and documentation, including but not limited to correspondences, notepads, ledgers, receipts, shipping documents, photographs and invoices, involving the purchase or sale of items composed of wildlife;
>
> b.  any and all records and documentation, including but not limited to required government notifications and forms, air way bills, packing slips, and invoices involving the transportation, exportation, importation, shipment and movement of wildlife in commerce;
>
> c.  any and all financial records, credit card statements, funds transfer service (*e.g.*, PayPal, Venmo, etc.) records, UPS records, DHL records, FedEx records, USPS records and other shipping service-related records including Express Mail records; and
>
> d.  any and all items composed of wildlife possessed or exported/imported in violation of federal and state regulations or without proof of legal purchase.

2.    Computers or storage medium used as a means to commit the

violations described above.

# ATTACHMENT D

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
IN THE MATTER OF THE SEARCH OF:                 MEMORANDUM
THE PREMISES KNOWN AND                          AND ORDER
DESCRIBED AS 950 72ND STREET, APT.
#2A AND ASSOCIATED STORAGE UNIT,                19-MC-10749 JO)
BROOKLYN, NEW YORK 11228 AND
INSIDE ANY LOCKED AND CLOSED
ITEMS CONTAINED THEREIN.
---------------------------------------------------------X

James Orenstein, Magistrate Judge:

The government has applied for a warrant to search the premises described in the caption. I write briefly to explain my decision to grant the application in part and deny it in part.

The supporting affidavit of the investigative agent supplies probable cause to believe that the premises is the home of one of two individuals who have occasionally engaged in conduct violative of statutes that prohibit trafficking in endangered species of wildlife and related offenses. The affidavit also supplies probable cause to believe that the suspects have engaged in that conduct in two locations: the subject premises, and the other subject's home in another district. The affidavit further supplies probable cause to believe that the suspects operate a web site and process their alleged unlawful transactions through email communications, thus making it likely that there are computers and electronic storage media somewhere that contain records that would constitute evidence of the offenses under investigation.

However, the affidavit does not include any allegation that the suspect keeps any such computers or storage media in the subject premises. The lack of such an assertion is particularly telling because the affiant recounts in detail his interview of the suspect who resides in the subject premises. *See* Affidavit ¶¶ 19-30, 50. The suspect provided details about

- the number of relevant transactions;

- the history of the company through which he conducts them;

- the vendor who provides web hosting service for the company;

- the business email address that he and the other suspect share;

- the fact that the suspects store inventory for the business at both of their premises;

- the methods of payment for the company's sales;

- where and when he obtained a particular contraband item, which he then stored in the subject premises;

- how he came to sell the latter contraband item; and

- his knowledge of the characteristics of the contraband.

*See id.* The affidavit does not include anything to suggest that the suspect, who was apparently willing to disclose a great deal of information about his business, including its use of electronic communications, reported having any computer or electronic storage media in the subject premises.[1]

The affidavit likewise includes no information that law enforcement often provides in comparable circumstances to show that particular electronic communications originated from a particular location. There is no mention of analysis of the internet protocol address associated with pertinent emails, nor of any subscriber records suggesting that the suspect has any internet service at the subject premises. In light of the fact that the investigation has revealed that the two suspects share the same email account, there is simply no way to determine that it is probable that the subject premises currently houses any electronic devices, or that it ever did.

Indeed, the affiant not only fails to demonstrate probable cause to believe that there are any computers or electronic storage media in the subject premises, he explicitly acknowledges that he does not know if there are. In a section entitled "Computers and Electronic Storage," Aff. at 13, the affiant includes a paragraph with the heading, "Probable cause." The first sentence of that paragraph

---

[1] If the suspect did provide such information, I will consider a renewed application that includes it.

posits "that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe that evidence of the Subject Offenses will be stored on [it]" and then explains the reasons for that belief. I wholly agree that if a computer or storage device is there, it may have relevant records stored on it. But that does not establish probable cause to believe that a computer or storage device will be found in a search of the subject premises. Moreover, as explained below, it is also possible that any computer or storage device in the premises will have nothing relevant at all.

The affiant reports that the suspect who lives in the subject premises shares that home with another person. *Id.* ¶ 56. He further acknowledges that "it is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime." *Id.* The affiant goes on to write that "To the extent that it can be established that computers or storage media are owned and used exclusively by [the person who shares the suspect's home], they will not be seized." *Id.* The affiant does not report how, or by whom, that determination will be made or what the agents executing the warrant will do if they are unsure. The affiant thus appears to propose that law enforcement personnel, rather than a neutral magistrate, will determine whether there is probable cause to seize and then search a computer or storage device found in the subject premises. The Fourth Amendment does not commit such a determination to an officer.

The court need not (and cannot) authorize a search based on speculation. Instead, the government may conduct a search of the premises for paper records and other physical evidence or instrumentalities of the offenses under investigation (see Aff. Attachment B, item 1) and then, if it discovers electronic devices, return to the court seeking a warrant to search those devices.

For the reasons set forth above, I grant the warrant application in part and deny it in part.

Should the government seek review of this decision by the miscellaneous district judge, I respectfully

direct it to immediately provide that judge with a copy of this memorandum.

SO ORDERED.

Dated: Brooklyn, New York
          November 14, 2019

_____/s/_____
James Orenstein
U.S. Magistrate Judge

4

# ATTACHMENT E

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of New York

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.    19-M-1074 |
| IN THE MATTER OF THE SEARCH OF: THE PREMISES KNOWN AND DESCRIBED AS 950 72ND STREET, APT. #2A AND ASSOCIATED STORAGE UNIT, BROOKLYN, NEW YORK 11228, AND INSIDE ANY LOCKED AND CLOSED ITEMS CONTAINED THEREIN | ) ) ) ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before      November 28, 2019      *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the Duty Magistrate Judge_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for   30   days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:      11/14/19    8:40 pm

Judge's signature

City and state:      Brooklyn, New York          Hon. James Orenstein          U.S.M.J.
Printed name and title

## ATTACHMENT A

*Property to be Searched*

The SUBJECT PREMISES is a single-family condominium unit and associated storage unit located at 950 72nd Street, Apt. 2A, Brooklyn, NY 11228 (the "950 Address"). The 950 Address is a brown and white colored three (3) floor condominium building located on 72nd Street between 10th Avenue and Fort Hamilton Parkway. The condominium unit is located on the second floor and the storage unit is located in the cellar. There are stairs leading up to the second floor where the SUBJECT PREMISES's residential unit door is located. A front porch is attached to the SUBJECT PREMISES. The number "950" appears on the front of the second floor balcony. The front door to the SUBJECT PREMISES is white with windows on the top of the door, and is the left one of the two doors located on the second floor of the 950 Address. The SUBJECT PREMISES door bears a visible lock. A photograph of the building containing the SUBJECT PREMISES is provided below:



**ATTACHMENT B**

*Property to be Seized*

All records relating to violations of 16 U.S.C. §§ 1538, 3372(a)(2)(A) and .

3372(d), and 18 U.S.C. §§ 371, 554 and 1956, those violations including acts by Eugene

Lantsman, Leonid Lantsman and Arms and Antiques Inc. and occurring after April 19,

2015, including:

      a. any and all records and documentation, including but not limited to correspondences, notepads, ledgers, receipts, shipping documents, photographs and invoices, involving the purchase or sale of items composed of wildlife;

      b. any and all records and documentation, including but not limited to required government notifications and forms, air way bills, packing slips, and invoices involving the transportation, exportation, importation, shipment and movement of wildlife in commerce;

      c. any and all financial records, credit card statements, funds transfer service (*e.g.*, PayPal, Venmo, etc.) records, UPS records, DHL records, FedEx records, USPS records and other shipping service-related records including Express Mail records; and

      d. any and all items composed of wildlife possessed or exported/imported in violation of federal and state regulations or without proof of legal purchase.